

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-16-1155

| | |
|---|---|
| | **Opinion Delivered** May 17, 2017 |
| LISA MICHELLE CHOATE AND RODERICK CHOATE | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-15-583] |
| APPELLANTS | |
| V. | HONORABLE STACEY ZIMMERMAN, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | REVERSED |
| APPELLEES | |

## DAVID M. GLOVER, Judge

By order entered October 14, 2016, the trial court terminated the parental rights of Roderick (Rod) and Lisa Michelle Choate to their two minor children, I.C. and K.C. Both parents appeal from that decision, presenting separate briefs. We reverse the termination of parental rights with respect to each.

To put this case in context, we have gleaned the following facts from a confusing record. On September 25, 2011, Lisa and Rod were married in Tulsa, Oklahoma. In August 2014, they separated, and Lisa and the children went to live with Lisa's parents, the Hebards, in Fayetteville, Arkansas, where she filed for divorce. On February 13, 2015, the divorce decree was entered. It gave Lisa custody of the children and provided strictly supervised visitation to Rod. In March 2015, Lisa and the children left the Hebards' house and went to live with Rod's parents in Tulsa. Rod was not living in the same house at the time. By

June 12, 2015, however, the couple was living together again in Oklahoma with the children when Oklahoma authorities applied to take the minor children into emergency custody. The Oklahoma application was accompanied by a "Declaration in Support of Verbal Application and Verbal Emergency Custody Order," which provided in part:

> 2.     Pursuant to an assessment of child safety conducted by the Department pursuant to a referral, the Department determined the children to be unsafe and in need of immediate protection due to the following imminent safety threat:  OKDHS was involved due [to] concern of Threat of Harm due to [K.C. and I.C.] regarding Mr. Choate's admission of having an erection while holding his daughter, [K.C.], walking around naked in front of his daughters and him admitting to watching child pornography. Ms. Choate has expressed to several people, including Arkansas CPS and law enforcement that she has had concern of him molesting their daughters.

Though the children were taken into emergency custody by Oklahoma officials, by June 15, 2015, they had been placed with the maternal grandparents in Arkansas pending transfer of the case to Arkansas. On the record before us, a criminal investigation seems to have arisen, but there is no evidence of any criminal charges ever having been pursued regarding any sexual-abuse allegation or child pornography.

According to an order entered July 9, 2015, by the Arkansas trial court, a telephonic hearing was held that date between it and the Oklahoma judge who had first exercised emergency jurisdiction over the children. As a result of the hearing, jurisdiction was found to lie in Washington County, Arkansas, and a date was set for the adjudication hearing.

A probable-cause order was entered July 15, 2015, in which the trial court found probable cause existed to enter the ex parte order for emergency custody; it still existed to protect the children, necessitating placement with the maternal grandparents, "because the court has concerns that mother violated the [divorce decree] and allowed the children to be [alone] with the father in Tulsa rather than supervised."

On August 24, 2015, the trial court entered an adjudication order finding the children dependent-neglected. The adjudication order is a typical form document and in paragraph 3, the finding of dependency-neglect was found to be a result of "neglect" and "parental unfitness" (designated by check marks next to those terms). No check marks appeared next to "abandonment," "abuse," "sexual abuse," or "sexual exploitation," which were the remaining options available on the form. The form adjudication order further provided in paragraph 3 that the finding was based on "the parties' agreement to a finding of dependency-neglect because the allegations in the petition and affidavit are true and correct, based on mother's lack of stability in housing and employment and failure to protect by violating the visitation order [apparently referencing the visitation order contained in the parties' divorce decree requiring supervised visitation with the children for Rod] and father's prior addiction to pornography and lack of stability in employment and housing." The court ordered Rod's visitation with the children to be supervised by DHS. Lisa was allowed to continue living in the Hebards' house, along with the children; her "visitation" with the children was to be supervised by the Hebards; and she was not to be left alone with the children. By order entered October 30, 2015, the trial court found Lisa had "made material progress through counseling, working with Children's House, and is now employed," and she "may be left alone with the children [for short periods per day, not to exceed three hours] so that the grandparents may have some respite time."

In the January 13, 2016 review order, the trial court found Lisa had not complied with all the court orders and the case plan; specifically, that she needed to address her mental-health issues and obtain appropriate housing if she did not choose to continue living with

her parents; that she had completed her parenting classes; that she had attended some IFS and family counseling; and that she had made some progress toward alleviating or mitigating the causes of the juveniles' removal from the home and completing the court orders and requirements of the case plan. In the same review order, the trial court found Rod had complied with all the court orders and the case plan; specifically, that he had maintained housing and employment in the Tulsa area; he was attending counseling to address his addiction to pornography; he was taking his medications as prescribed; he had completed his parenting classes; he had been consistent in his visitation with the children twice monthly, and he had made much progress toward alleviating or mitigating the causes of the juveniles' removal from the home and completing the court orders and requirements of the case plan. Rod's visitation was to remain supervised by DHS. Lisa was allowed to have unsupervised visitation at the Hebards' discretion.

On June 6, 2016, the permanency-planning-hearing order was entered. In it, the trial court authorized a plan for adoption with DHS filing a petition for termination of parental rights because "[n]either parent has made significant, measurable progress toward achieving the goals established in the case plan," "[n]either parent has diligently worked toward reunification," and "[t]he girls need a consistent, structured home life," which the trial court found the parents had demonstrated they could not provide.

On September 9, 2016, the termination hearing was held in Washington County, Arkansas. Numerous witnesses testified in a lengthy hearing. Melissa Bedford, who was a counselor at Dayspring Behavioral Healthcare (Children's House), was among the witnesses who testified. She stated she had served as K.C.'s counselor from September 21, 2015, to

the date of the hearing, and as I.C.'s counselor since August 2, 2016. She explained K.C.'s diagnosis was posttraumatic stress disorder; suspected child sexual abuse; parent–child relational problem; child neglect; and developmental disorders. Bedford testified that K.C., who turned four in June before the September hearing, had engaged in play that caused her concern, e.g., she had put dolls in the sand and said they weren't supposed to see, with a male figure standing over saying they weren't supposed to see or know; she put a 3-D puzzle figure in the bathtub and wanted it to be naked; she became upset when she couldn't get the clothes off; and she played with baby dolls and wanted them to be naked. After discussing modesty with her, Bedford said K.C. made progress and wanted her dolls dressed.

Bedford observed K.C. never mentions Rod, and never says "my dad," but does ask when she's going to see her mom. She said Rod never participated in family therapy; she also acknowledged it was never ordered.

Bedford testified Lisa had been more cooperative since the last hearing; before then, Lisa showed up about 75 percent of the time; on two occasions, in meetings, Lisa had become upset with her mother, Linda Hebard, and said she could not meet with the girls and left; Lisa had made some progress; Lisa was starting to use conscious discipline techniques and they had engaged in family-play therapy.

Bedford's recommendation was for K.C. to either remain with the Hebards (grandparents) or be placed in an adoptive family. She did not feel as if Lisa had worked through enough of her parenting issues; and Lisa had made comments about Rod's being suicidal, and that concerned Bedford about the children's safety.

Bedford acknowledged: I.C. had been her patient for only about a month, since August; I.C. had a new development in the last couple of weeks going from very oppositional and aggressive to being very concerned about noises in the hallway; and I.C. had become very agitated a couple of days ago at the school, wanting the teachers to sit between her and the doorway—concerned a monster was going to get her. Bedford's recommendation for I.C. was that she remain with K.C. and either live with the maternal grandparents or an adoptive family.

Bedford explained that sexual abuse was suspected with both children. She stated, however, the only thing that concerned her about I.C. was "last year" the teachers contacted her to come observe I.C. during nap time, and I.C. was touching herself and "moaning inappropriately." Regarding K.C., the suspected sexual abuse had to do with the "sexual acting out in her play," which Bedford said she has not been doing lately.

Bedford stated neither K.C. nor I.C. appeared to be afraid of Lisa or Rod, although K.C. pretended to put on some wings one time and said she needed to get away from dad. Bedford acknowledged Linda Hebard could be overbearing and that it would be hard for Lisa and Linda to live together in the same house.

Miranda Collins, a family-service worker for Washington County DHS, testified at length. It was her recommendation to terminate the parental rights of Lisa and Rod. She said the children had been placed with the grandparents, Linda and John Hebard, but this was not a potential adoptive placement. She also testified the children were adoptable. She gave very glowing descriptions of the girls. She testified as follows. Another family member might serve as a possible placement, maybe a long-term placement, but that person lived

out of state; if the court did not terminate parental rights, DHS would be able to pursue an ICPC home study; she did not believe K.C. and I.C. would be safe if they were returned to Rod's custody given "the history and the ongoing concerns with his porn addiction and definitely the testimony of the therapist today"; and the concern about placement with Lisa was that she had remarried Rod earlier in the year and did so even after he admitted having the porn addiction.

Collins indicated the parents were in partial compliance with the case plan and court orders; she had not been able to see the conditions of the couple's home because they lived out of state; and she also had not been able to verify Lisa was taking her prescribed medication to control her anxiety and depression. Collins said she did not feel either parent had demonstrated they could protect the children and keep them safe from harm.

On cross-examination, Collins acknowledged she had reported that Lisa had not maintained clean and stable housing despite her having never been to the home because she could not cross state lines; that the same was true with Rod. She further acknowledged she had also reported Lisa had not maintained stable employment while being aware Lisa was on disability. She also reported Rod had not maintained stable employment though she knew he had been employed at Dairy Queen; she did so because his hours vary. Collins confirmed, "Everything I put down that they have not done, is not stuff I really know."

Collins further confirmed: she did not know the exact address of Lisa's sister, who might want to adopt the children; she had not talked to Rod's or Lisa's counselors; she had not contacted Rod or Lisa since becoming the caseworker; Lisa and Rod contacted her weekly but she had never called them; she had been the caseworker for two months; Rod

was attending individual counseling; and Rod took his parenting classes, which he paid for himself.

According to Collins, the girls came into care because Lisa allowed the girls to be around Rod unsupervised; the situation had not been remedied; and instead Lisa remarried and moved in with Rod, who was not supposed to have any unsupervised contact with the children. On further cross-examination, she acknowledged she did not know the names of any people who had ever seen Rod alone, i.e., unsupervised, with the girls.

Lisa Choate testified as follows. She was prepared to take the children home; her apartment had plenty of room and was clean and safe; she had lived there since February of "this year" and her husband had lived there since December of "last year"; her husband had been employed at Dairy Queen for over a year; she was on disability; they had financial stability; she attended counseling every Tuesday, and she and Rod went twice a month for visitation at DHS; she had attended every visitation; Rod had been going to Celebrate Recovery for over two years; she did not believe DHS had provided much assistance with services to get her daughters back; and she did not believe Rod had abused the children and if she did, she would not be with him.

Lisa testified that if the court told her that day she could have the girls back if she moved out and divorced Rod, she would not do it. She recounted she has been reunited with Rod since February 2016.

Lisa acknowledged when she and Rod divorced, there was a court order that said he could have only supervised visits; she testified he was never around the children unsupervised after the date of the divorce decree. She explained the reason she didn't feel

she should have to give up her husband or her children was because she is convinced "he's done nothing wrong"; and she said the girls do not ever have a problem being around Rod at the visits.

Rod Choate testified he had been seeing Salley Sutmiller at the Christian Family Institute since September 2014, and the court had asked for documentation of his counseling and therapy sessions at the previous hearing. Rod then said that he had brought the requested documentation with him. The attorney ad litem objected based on hearsay; the trial court sustained the objection but allowed the evidence to be proffered.

Rod stated he is in Celebrate Recovery for an adult-porn addiction and he had been addiction free for two years. He explained the steps he had taken to ward off any possible addiction urges. He stated he had never been with his girls unsupervised since the divorce; his girls did not seem to have a problem being around him; they called him dad and told him they loved him; he took twelve hours of parenting classes; his kids would not be in danger if they came to live with him and Lisa; he had never shown porn to his kids; he had one "slip-up" a couple of months ago, but talked to his therapist at the very next meeting; and the slip-up involved adult pornography, not child pornography. He acknowledged his previous statement to the court that he had viewed child pornography in 2009, but did not care for it and moved on. He testified he was not suicidal.

David Choate, Rod's father, who also lives in Tulsa, Oklahoma, testified he has lived there for twenty-six years; he had regular contact with Rod; he believed Rod had made progress on his sexual-addiction issues; he did not believe he was a danger to the children;

he knows his son pretty well and does not think he is the kind of guy who would sexually abuse his own children; and if he thought Rod would, he would not be there.

Linda Hebard, Lisa's mother and the children's maternal grandmother, testified the children had been with her since July 15, 2015; they were doing very well; I.C. did have a severe urinary tract infection, as Lisa stated, but she could not say if that was why I.C. had been touching herself; she had touched herself on other occasions; I.C. made lots of body movements with her hips—not like a little girl; it was disconcerting to watch; she had concerns about the girls being returned to their mother; she thought Lisa showed more affection to I.C. and that K.C. was aware of it; K.C. did not keep clothes on her dolls; she had concerns about the girls being placed with Rod; Lisa had recently said, "You all don't have to go home to the wrath of Rod," talking about his temper; she had witnessed Rod's lack of control in his temper; she did not think the girls would be safe; the children had improved socially and emotionally since being with her and her husband, but that I.C. had become very anxious in the last month; I.C. talked about somebody coming to the door, it was strange behavior, and she did not know why it had started.

Hebard believed both girls were adoptable, and they needed to be together. Along those lines, she said it was her other daughter who was the family member interested in adopting the girls; her other daughter had five children, two of whom are autistic; she did not even know if that daughter had a home to live in; and she did not think the other daughter would pass a home study. It was Hebard's opinion that even if Rod were gone, she did not believe Lisa should have the girls because she did not have the stability, interest, or ability to take care of them financially or emotionally.

Lisa Choate then took the stand again to respond to her mother's testimony. She testified when she talked about Rod's wrath, it was because there is animosity between her parents and Rod; Rod knew her mother was overbearing and controlling; he had to deal with her (Lisa) crying every time she came home on Tuesdays; his wrath was not directed at her (Lisa); it was directed at her mom; she was never worried that his wrath would be directed at the girls; and she (Lisa) had an order of protection against Rod until April 2015 because, during the investigation, she did not know whether he was a threat, and Detective O'Dell and Michael Fitch of Children's Services in Arkansas asked her to get the protective order.

Following the termination hearing, the trial court entered one order terminating the parental rights of both parents. In it, the court found that DHS had proved two statutory grounds by clear and convincing evidence—"failure to remedy" and "subsequent factors." Ark. Code Ann. § 9-27-341 (Repl. 2015). After conducting our de novo review, we are left with a definite and firm conviction that the trial court made a mistake.

I. *The Termination of Rod Choate's Parental Rights*

Rod's basic contention is that the trial court clearly erred in terminating his parental rights. We agree.

We review termination-of-parental-rights cases de novo. *Guthrey v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 19, 510 S.W.3d 793. The grounds for termination must be proved by clear and convincing evidence. *McPherson v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 525. When the burden of proving a disputed fact is by "clear and convincing evidence," the question on appeal is whether the trial court's findings that the disputed fact

was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* We reverse a trial court's decision to terminate parental rights only when it is clearly erroneous. *Guthrey, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made. *Id.*

### A. Failure to Remedy Ground.

In the termination order, the trial court found in pertinent part:

> a.      The juveniles have been adjudicated by the Court to be dependent-neglected and have continued out of the custody of the parents for twelve (12) months and despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions which caused removal, those conditions have not been remedied by the parents (*see* A.C.A. § 9-27-341 (b)(3)(B)(i)(a)).
>
>      Specifically, the juveniles were removed from the home on June 11, 2015 and were adjudicated dependent-neglected on August 24, 2015 due to neglect and parental unfitness. The juveniles have thus been outside the custody of a parent for twelve (12) months. Despite a meaningful effort by the Department (evidenced by this Court finding at the Adjudication Hearing on August 24, 2015 and at the Review Hearing on January 13, 2016 and at the Permanency Planning Hearing on June 1, 2016 that the Department had made reasonable efforts toward the goal of reunification), the conditions which caused removal have not been remedied by the parents.
>
>      *Specifically, this Court found at the Permanency Planning Hearing on June 1, 2016 that "[n]either parent has made significant, measurable progress toward achieving the goals established in the case plan. Neither parent has diligently worked toward reunification. The girls need a consistent, structured home life. The Court finds that the parents have not demonstrated that they can provide such consistent care for the juveniles." The Court likewise found that both parents were in partial compliance but that "the girls would not be safe if they were returned to the custody of a parent today" and that "the parents have not addressed the root cause of this case: parents' stability, parents' inability to properly parent these special needs children, and the Court's major concern that father poses a threat of sexual abuse to the children." The Court found at the Adjudication Hearing on August 24, 2015 that the juveniles were dependent-neglected due to the fact that Mother failed to protect the children "by violating the*



> *visitation order and father's prior addiction to pornography and lack of stability in employment and housing." The same concerns are present today, and today neither parent has remedied the conditions which caused removal.*

(Emphasis added.)

The conditions that caused removal of these two children, as found in the adjudication order and recited in the termination order, were "based on *mother's* lack of stability in housing and employment and failure to protect by violating the visitation order and *father's* prior addiction to pornography and lack of stability in employment and housing." (Emphasis added.)

Rod first contends the divorce decree awarded custody of the children to Lisa, not him, and thus, technically, the children were not in his custody at the time of removal. Even if we ignore that fact because it is undisputed that Lisa, Rod, and the children were once again living together in Oklahoma at the time of removal, the conditions cited by the trial court related to Rod are not supported by the evidence before the trial court. Those conditions were "prior addiction to pornography and lack of stability in employment and housing." The trial court also recounted in its order the findings from the permanency-planning hearing that the parents had not made measurable progress toward achieving the case-plan goals, had not diligently worked toward reunification, needed a consistent structured home life, and that "the parents had not addressed the root cause of this case: parents' stability, parents' inability to properly parent these special-needs children, and the Court's major concern that father poses a threat of sexual abuse to the children." The termination order concludes that "[t]he same concerns are present today, and today neither parent has remedied the conditions which caused removal."

Addressing the removal-causing conditions related to Rod under this section, we are unable to find evidence from the termination hearing that supports the trial court's conclusion. With respect to stability in employment and housing, the DHS family-service worker acknowledged in her testimony she had included several items in her court report that she really did not know:

> In my court report I say Lisa has not maintained clean and stable housing, but I admit that I've never been to their home, but it's my understanding that that's Roderick's home. They're married. They live together. It's just his home because he has maintained the stability in the house. Even during the divorce, it was my understanding that that was his home. I don't know the exact time frame that he lived there. I don't have any idea if it's clean.

> I just said I don't know how long they've lived there. I can't say it's not clean or stable because I don't know. I haven't been there. It could be, could not be. As for if it's their fault I haven't been there, well, I can't cross state lines. I can get DHS in Oklahoma to go check out the home.

> I say that Lisa has not maintained stable employment, but I am aware that she's on disability. I'm not requiring her to have stable employment. There were some concerns about Lisa having to sell some things to get to her sessions with the girls. I don't think we should go around and take everybody's children away who have to sell some things to make ends meet.

> As I said, Roderick has not maintained clean and stable housing, but that is the same apartment we just talked about. He has been employed. He's employed at Dairy Queen. I don't know the exact time frame that he's been employed there, but his [hours] vary, so. If he's been employed there for about a year, I would say that was stable. I say he's not maintained stable employment because, again, his hours vary, so it's not a stable income. It varies. And again, things were having to be sold to get here for visits and such.

> I've not verified about what medication he's taking that's prescribed. He could be taking his medication as prescribed, but I don't know. *Everything I put down that they have not done, is not stuff I really know.*

(Emphasis added.)

Similarly, even though the initial declaration in support of the Oklahoma verbal application for emergency custody contained concerning language about child pornography and fears of child molestation, those allegations were never established in any forum. Here, the only evidence before the trial court about child pornography came from Rod himself, who acknowledged he had viewed child pornography once in 2009—approximately three years before the children were even born, he did not care for it, and he had "moved on." Moreover, while Rod acknowledged he was addressing through therapy an addiction to adult pornography, we have been unable to find any authority to support the notion that an addiction to adult pornography—as long as the children are not exposed to it in any fashion—provides a basis for termination of parental rights. There was no evidence here that these children were exposed to such material. In addition, the adjudication order described Rod's issue as a "*prior* addiction to pornography," and none of the boxes for "abuse," "sexual abuse," or "sexual exploitation" were checked in the adjudication order.

Our de novo review of the record leaves us with a definite and firm conviction the trial court made a mistake in concluding that the statutory "failure to remedy" ground was proven by clear and convincing evidence. At worst, it was established that the family-service worker did not know whether Rod's housing and employment were stable; at best, it was established that he had lived in the same home since before the parties divorced, and even if Rod's hours varied, he had worked for Dairy Queen for at least a year, and the only example of income instability offered was that the couple had to sell things to get to "visits and such."

### B. Subsequent Factors.

The other statutory ground relied upon by the trial court to terminate Rod's parental rights was "subsequent factors," which provides "[t]hat other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile[s] in the custody of the parent[s] is contrary to the juveniles' health, safety, or welfare and that, despite the offer of appropriate family services, the [parents have] manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent[s'] circumstances that prevent the placement of the juvenile[s] in the custody of the parent[s]." Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* (Repl. 2015).

With respect to the "subsequent factors" finding, the termination order provides in pertinent part:

> Specifically, subsequent to the filing of the original petition in this case, Mother and Father separated. This Court expressed concerns at the Adjudication Hearing about Father's addiction to pornography. Mother was living with her parents, and she was making some progress toward the goal of reunification. However, subsequent to the January 13, 2016 Review Hearing and before the June 1, 2016 Permanency Planning Hearing, Mother re-married Father. The Court found at the Adjudication Hearing on August 24, 2015 that the juveniles were dependent-neglected due to the fact that Mother failed to protect the children "by violating the visitation order and father's prior addiction to pornography and lack of stability in employment and housing." The Court then found at the Permanency Planning Hearing, 9 months later, that "the parents have not addressed the root cause of this case: parents' stability, parents' inability to properly parent these special needs children, and the Court's major concern that father poses a threat of sexual abuse to the children." Mother chose to re-marry Father despite being aware that the Court and the Department have serious concerns about Father's appropriateness and parental fitness. Father has admitted to this Court that he has viewed child pornography. Father has walked around naked, holding the children—and on at least one occasion Father had an erection while doing so. The Mother made a choice in re-marrying the Father, and this subsequent factor demonstrates that the juveniles cannot be placed with Mother and that Mother is not making proper, protective decisions as regards her children. Father has not demonstrated to this Court that he is a fit and proper parent for the children.

The only "subsequent factors" we can discern the trial court relied upon in finding DHS had proved this ground by clear and convincing evidence was summarized in the above-quoted language from the termination order, which bears repeating: "The *Mother* made a choice in re-marrying the Father, and this subsequent factor demonstrates that the juveniles cannot be placed with *Mother* and that *Mother* is not making proper, protective decisions as regards her children. *Father has not demonstrated to this Court that he is a fit and proper parent for the children.*" (Emphasis added.)

Lisa's choices and decisions will be discussed with respect to the termination of her parental rights. Regarding Rod, our de novo review of the record again leaves us with a definite and firm conviction the trial court made a mistake in concluding that the statutory "subsequent factors" ground was proved by clear and convincing evidence. There are no "subsequent factors" relating to housing, employment, or pornography addiction. Rather, the only "subsequent factor" relied on by the trial court appears to be that Rod "has not demonstrated to this Court that he is a fit and proper parent for the children." We need say no more than to note that the order provides no facts to support "subsequent factors" for Rod and to point out that it is not a parent's burden to prove he or she is a fit and proper parent; rather, it is DHS's burden to prove he or she is not. *See* Ark. Code Ann. § 9-27-325(h)(1) (Repl. 2015).

Because our review of this case convinces us that the trial court clearly erred in finding that statutory grounds for termination of Rod's parental rights had been proved, it is unnecessary to address the remaining statutory requirements for termination and also

 

unnecessary to address Rod's remaining arguments. We reverse the termination of Rod's parental rights to I.C. and K.C.

## II. *The Termination of Lisa Choate's Parental Rights*

We turn now to the trial court's termination of Lisa's parental rights. She contends in part the trial court committed reversible error in terminating her parental rights because DHS failed to prove by clear and convincing evidence that the statutory grounds raised in the petition to terminate existed. We agree.

As explained earlier in this opinion, there is one order terminating the parental rights of both Rod and Lisa. The statutory grounds relied upon by the trial court were the same for both parents: "failure to remedy" and "subsequent factors." Because we previously quoted the trial court's termination-order findings, it is unnecessary to repeat them fully here. Rather, we will discuss the findings pertaining jointly or specifically to Lisa.

## *A*. Failure to Remedy Ground.

The conditions causing removal that pertained to Lisa were based on her "lack of stability in housing and employment and failure to protect by violating the visitation order . . . ." As with Rod, our de novo review of the record leaves us with a definite and firm conviction the trial court made a mistake in concluding that the statutory "failure to remedy" ground was proven by clear and convincing evidence with respect to Lisa.

As was true regarding Rod and as previously quoted at length, the family-service worker, in effect, testified that "[e]verything [she] put down that they have not done, is not stuff I really know." She acknowledged the following relevant information. Lisa was on disability but stated she "was not requiring [Lisa] to have stable employment"; she had some

18

concerns about Lisa having to sell some things to get to her sessions with the children but stated she did not "think we should go around and take everybody's children away who have to sell some things to make ends meet"; and she had never been to Lisa and Rod's home and had no idea if it was clean or stable (even though her court report stated Lisa had not maintained clean and stable housing). In addition, the court relied on Lisa's "failure to protect" the children from Rod, but as previously discussed at length under the termination of Rod's parental rights, DHS provided no evidence upon which to base a conclusion that Rod was doing anything Lisa needed to protect the children from.

## B. Subsequent Factors.

The trial court's findings on this statutory ground have already been quoted in full. It is clear that, with respect to Lisa, the trial court concluded Lisa's return to living with Rod was the subsequent factor that demonstrated placement of the children with her was contrary to their health, safety, or welfare, and Lisa had manifested the incapacity or indifference to remedy that situation, i.e., to leave Rod. It is impossible to see a basis for concluding that, in returning to Rod, Lisa was not making "proper, protective decisions as regards her children" when DHS did not satisfy its burden of proving he was a threat to the children. Because DHS failed to demonstrate how Rod was unfit and a threat to the children, this "subsequent factor" basis for termination of Lisa's parental rights must fail also.

As with Rod, because our review of this case convinces us the trial court clearly erred in finding that statutory grounds for termination of Lisa's parental rights had been proved, it is unnecessary to address the remaining statutory requirements for termination. We therefore also reverse the termination of Lisa's parental rights to I.C. and K.C.



Reversed.

VIRDEN and HARRISON, JJ., agree.

*Dusti Standridge*, for appellant Roderick Choate.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant Lisa Choate.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.