

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–17–603

|  |  |
|---|---|
| | **Opinion Delivered** November 15, 2017 |
| PATRICIA BURLESON | APPEAL FROM THE CONWAY |
| APPELLANT | COUNTY CIRCUIT COURT [NO. 15JV-16-7] |
| V. | |
| | HONORABLE TERRY SULLIVAN, |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | JUDGE |
| APPELLEES | |
| | AFFIRMED |

### BRANDON J. HARRISON, Judge

Patricia Burleson appeals the termination of her parental rights. She argues that the Arkansas Department of Human Services (DHS) failed to prove at least one ground for termination and that the termination was not in her children's best interest. We affirm.

I.

In January 2016, DHS petitioned for emergency custody of M.B., T.R., and A.R. based on the affidavit of caseworker Tammy Foster. The court found that a police officer had gone to the Burleson home around 8:00 am on 13 January 2016. The front door to the apartment was open, and Burleson, her husband, A.R., and M.B. were sleeping. The officer said that the parents "had no clue that the front door was open, that [T.R.] was gone, or that the officer was inside of the home." The family had an open Family in Need of Services (FINS) case, and Burleson was arrested for failing to appear for a court hearing

related to T.R.'s school absences. The home was filled with rotten food and was very dirty, which was consistent with DHS's observations in its prior involvement with the Burlesons. Burleson stipulated that probable cause existed for the children's removal.

In March 2016, the circuit court adjudicated the children dependent-neglected because the "squalor in the home . . . posed a danger to their health and safety" and because Burleson tested positive for THC at the time of removal. Burleson was ordered to submit to random drug screens, complete parenting classes, obtain and maintain stable housing and employment, attend counseling as recommended by her counselor or therapist, submit to a psychological evaluation and drug-and-alcohol assessment, resolve all criminal issues, and cooperate with DHS and keep DHS notified of new phone numbers and addresses.

The court held a review hearing in July 2016 and found that Burleson had minimally complied with the case plan and court orders. It noted that Burleson had made three suicide attempts since the case started. She had no housing, proof of employment, had not started her psychological evaluation or drug-and-alcohol assessment, and had attended counseling sporadically. The court wrote that Burleson "denies drug use despite positive drug tests, including laboratory confirmed tests for meth." Burleson "completed her parenting classes but is not demonstrating she has learned anything." The court scheduled the next hearing as a permanency-planning hearing because "there has been no progress in the six months this case has been open." Visitation was set at "the discretion of the custodian, contingent on clean random drug screens . . . refusal to test or failure to provide a sample adequate for testing shall be considered a positive test."

SLIP OPINION

A permanency-planning order was entered in December 2016 authorizing a plan for adoption. DHS filed a petition for termination of parental rights against Burleson, and a termination hearing was held in April 2017.

DHS called Brenda Dixon as its first witness. Dixon, a paramedic, described two events in February 2017 in which she was called to Burleson's residence for an emergency call. One incident involved Burleson smelling of alcohol, being passed out in the floor, and having trouble breathing. The other event involved abdominal and chest pain.

Caseworker Sarah Rion testified that she was assigned to the case three months before the termination hearing. She said that the one drug screen she had given Burleson was negative. She testified that Burleson had participated in parenting classes but had not completed them. Burleson was enrolled in counseling, but she did not complete a psychological evaluation until February 2017, more than one year after she should have had it done. A drug-and-alcohol assessment was also completed in February 2017. She reported that Burleson said that she was employed at the Morrilton Drive Inn and at Wendy's but did not have proof of either of those jobs. According to Rion, Burleson was living at Station House (government housing) with a male friend in a studio apartment. She said that Burleson failed to contact DHS when she moved to Marshall earlier in the year.

On cross-examination, Rion admitted that she did not have firsthand knowledge of Burleson's past move to Marshall. When questioned by the court and parent counsel, Rion explained that Burleson had not been offered visits with her children since the permanency-planning hearing in October 2016. Upon further questioning, Rion said that the previous caseworker was sick and was going to be on "standby."

SLIP OPINION

DHS supervisor Brandy Cochran testified that Burleson lived in Marshall for about two months of the sixteen months the case had been opened. She testified that Burleson had not visited her children since November 2016, and her visitation had been sporadic. According to Cochran, Burleson would show up to visitation and test positive for drugs. She behaved erratically at times and at other times would just not show up, and it affected the children poorly. T.R. would become upset after visitation, soil his pants, cry, and be disruptive at school.

In Cochran's opinion, the primary issue that prevented reunification between Burleson and her children was her mental instability and her housing and employment instability. Cochran testified that the three children were highly adoptable with no physical or mental issues that would be a barrier to adoption. The children were currently living with their maternal grandmother.

On cross-examination, Cochran stated that there were spans of time when Burleson did not visit for three or four weeks at a time, and that there were substantial periods of time when "she kind of disappeared" and was not in compliance "with anything." She said that Burleson received a certificate of attendance for the parenting classes but did not demonstrate what she learned in the classes. According to Cochran, DHS did not have any idea where Burleson lived from January 2016 until January 2017.

Rebekah Pevia, T.R. and A.R.'s therapist, said that the children's behavior escalated "a lot depending on whether there was a visit, whether there was a visit that was expected and it did not occur, or if there was a visit." She noted that the children's behavior generally

worsened after visitation. In her opinion, T.R. had a lot of anger about the life events that occurred prior to foster placement.

Tiffany Glendenning, the children's foster mother and step-grandmother, testified that Burleson visited the children only nine to eleven times. She said that T.R.'s behavior improved once the visitation stopped. Glendenning said that T.R. loves his mother, but he does not want to live with her. On cross-examination, Glendenning testified that the children had issues with hiding food and overeating when they came to her house and they had to reassure the children that they could buy groceries.

Casey Myers, a therapist at Dayspring Behavior Health, testified that she treated Burleson. She said that she had seen Burleson seven times and that Burleson was progressing in treatment. In her view, sometimes Burleson's anxiety "gets the best of her." She concluded, however, that Burleson was complying and doing what she needed to do.

On cross-examination, Myers read from a report she authored that described how Burleson had been arrested and spent the night in jail because of an unpaid speeding ticket and how her live-in boyfriend had left a bruise on her right side the size of a hamburger. She also said that Burleson and her boyfriend had recently parted ways. She testified that Burleson was not finished with therapy and that she had no idea how long her treatment should last.

Burleson testified that she recently leased a two-bedroom, one-bath home. She said that she worked at Wendy's and before that at Morrilton Drive Inn. She described the medication she was taking and that she was working on anxiety issues. According to Burleson, DHS had not tested her since the permanency-planning hearing because they told

her the "case was over" so she paid for a hair-follicle test. She testified that she asked Caseworker Rion about visiting her children but was denied and was told she would have to go to court again "because the child advocate said no."

On cross-examination, Burleson admitted to mental-health diagnoses of bipolar disorder, PTSD, and social anxiety. She admitted not having stable housing in the past and that she had stable housing for seventeen days. She said that the caseworker told her that it was over and she needed to lose hope. When questioned by the court, Burleson admitted that her ex-boyfriend bailed her out of jail the month before when she was arrested on failure to pay a speeding ticket.

The court entered an order terminating Burleson's parental rights on 21 April 2017. The court found that DHS had proved the three grounds it alleged against Burleson. The court wrote,

> [T]he Court is mindful of mother's attempt to follow the case plan and court orders since the permanency planning hearing on October 27, 2016. Mother obtained employment, obtained housing, completed her psychological evaluation, completed her drug and alcohol assessment, and two drug screens were testified to today, one having been entered as an exhibit, which show mother testing negative for all illegal substances. Despite this progress and meaningful efforts made by the Department, the juveniles have been removed from the home since January 13, 2016, and mother did not begin complying with the case plan until December 2016, after the permanency planning hearing. Furthermore, the Court is concerned that within the last month that mother had a live-in boyfriend and was arrested, yet failed to inform the Department.
>
> . . . .
>
> The Court finds by clear and convincing evidence that it is in the best interests of the juveniles to terminate parental rights. In making this finding, the Court specifically considered the likelihood that the juveniles will be adopted if the petition is granted and the potential harm on the health and

safety of the juveniles caused by returning the juveniles to the custody of either parent.

II.

A circuit court's order that terminates parental rights must be based on clear and convincing evidence. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Pratt v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 399, 413 S.W.3d 261. Proof of only one statutory ground is sufficient to terminate parental rights. *Gossett v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205. A circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm caused by returning the child to the custody of the parent. Ark. Code Ann. § 9–27–341(b)(3)(A)(i)–(ii) (Repl. 2015).

In this case, the circuit court terminated Burleson's parental rights on three grounds:

- Ark. Code Ann. § 9-27-341 (b)(3)(B)(i)(*a*): That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent;

- Ark. Code Ann. § 9-27-341 (b)(3)(B)(vii)(*a*): That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent; and

- Ark. Code Ann. § 9-27-341 (b)(3)(B)(ii)(*a*): The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile.

Termination of parental rights is a drastic remedy that is necessary to provide permanency in a juvenile's life in circumstances in which return to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark. Code Ann. § 9-27-341(a)(3). That means that a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Fredrick v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 104, 377 S.W.3d 306.

We hold that the court's decision to terminate Burleson's parental rights on the "subsequent factors" ground is not clearly erroneous. Here the children's need for permanency and stability overrides Burleson's eleventh-hour efforts. Burleson failed to follow the court's orders and case plan throughout most of the case. Her whereabouts were unknown to DHS for most of 2016. The July 2016 review order noted Burleson's suicidal struggles and positive tests for illegal drug use, and she had not visited the children for more than a month. The December 2016 permanency-planning order also noted that she had not visited the children, had not completed a drug-and-alcohol assessment and treatment, had not attended counseling or done a psychological assessment, and had outstanding criminal issues. And even at the termination hearing, Burleson admitted that she had not notified DHS of her new address and had only started participating in the case since

December 2016. It was only within the past seventeen days before the termination hearing that Burleson obtained stable housing and had completed her assessments only within the prior month.

In addition, the children's therapist, Rebekah Pervia, testified that Burleson's unpredictability and inconsistent visitation were having a negative impact on her children, and that the children were doing well in their current placement with Burleson's father and stepmother. While Burleson's therapist, Casey Myers, testified that Burleson had been participating in counseling, she had "no idea" when Burleson would reach a point of stability and an ability to wrap up therapy. Her testimony also revealed that Burleson had just recently left a romantic relationship with a man who allegedly abused her and that she had an outstanding criminal issue.

The same evidence that supports the subsequent-factors ground also supports the court's best-interest finding. Yet in Burleson's view, the "question presented in this appeal is whether the public policy of the state is furthered when terminating the parental rights of a mother when the mother never physically harmed her children, the children were in the permanent custody of a relative, the children wanted to continue to have contact with their mom, and the mother made marked progress towards the end of the case." We disagree. The circuit court had evidence that the children had been harmed by Burleson's neglect and were at risk for future harm should they be returned to the home.

Pevia testified that T.R. has a lot of anger about the life events that occurred prior to foster placement. Tiffany Glendenning testified that the children had issues with hiding food and overeating when they came to her house and they had to reassure the children

that they could buy groceries. She also said that although T.R. loved his mother, he did not want to return to her care. Both Glendenning and Pevia described the negative impact Burleson's sporadic and unpredictable contact had on the children. Cochran testified that the three children were highly adoptable with no physical or mental issues that would be a barrier to adoption, which the court considered. It can be in the best interest of a child to terminate a parent's parental rights when doing so is calculated to provide that child with stability and permanency. *See Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356, at 12. The court's best-interest finding is not clearly erroneous given the long history of the case, Burleson's recent altercation and arrest, her failure to keep DHS informed, her failure to comply with the case plan for almost a year, and the severity of the conditions that brought the children into the State's care.

### III.

Having reviewed the entire record, we are not left with a definite and firm conviction that a mistake was committed. The circuit court's termination order is therefore affirmed.

Affirmed.

GRUBER, C.J., and VIRDEN, J., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.