Cite as 2019 Ark. App. 387

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-18-988

| | |
|---|---|
| LISA CHOATE AND RODERICK CHOATE | **Opinion Delivered:** September 18, 2019 |
| APPELLANTS | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-15-583] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE STACEY ZIMMERMAN, JUDGE |
| APPELLEES | AFFIRMED |

## MEREDITH B. SWITZER, Judge

Lisa and Rod Choate appeal from the September 25, 2018 order terminating their parental rights to their minor children, K.C. and I.C. This is the second time their parental rights to these two children have been terminated. K.C. and I.C. were removed from the Choates' custody in June 2015 and adjudicated dependent–neglected by order entered August 24, 2015. The circuit court subsequently terminated the Choates' parental rights by order entered in October 2016. This court reversed that decision in an opinion delivered May 17, 2017. *Choate v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 319, 522 S.W.3d 156. (*Choate I*). The Choates now bring separate appeals from a second termination-of–parental-rights (TPR) order entered on September 25, 2018. They raise three alternative points: (1) the circuit court lacked jurisdiction of the case following *Choate I*; (2) even if the circuit court correctly resumed jurisdiction of the case, it erred in not immediately

returning custody of the children to them and closing the case at the permanency-planning hearing because their presumption of parental fitness was restored by *Choate I*; and (3) even if the circuit court had jurisdiction to proceed to termination, there was insufficient evidence to support the circuit court's findings regarding statutory grounds and best interest. We affirm.

Following the reversal in *Choate I*, the circuit court ordered a permanency-planning hearing for June 9, 2017. The Choates filed a joint motion for change of custody asserting that the circuit court lost jurisdiction of the case when the termination was reversed in *Choate I*; that *Choate I* had restored their presumption of parental fitness and their rights to the care, custody, and control of their children; and that the children should be returned to them immediately. The circuit court denied the motion, explaining in part that *Choate I* did not disturb the August 24, 2015 dependency-neglect adjudication, that the circuit court retained jurisdiction over the children pursuant to the adjudication, and that it was obligated to conduct a permanency-planning hearing to assess the children's current status because they had been out of the Choates' care and custody since 2015. The goal of the case was changed to reunification, and a progressive schedule of counseling sessions and visitation was implemented, along with various services, to achieve that goal. In March 2018, however, the children's attorney ad litem filed a petition to terminate, and in June 2018, the ad litem and DHS filed a joint amended petition to terminate. The petition alleged three statutory grounds for termination: (1) twelve-month failure to remedy, (2) subsequent factors, and (3) aggravated circumstances—little likelihood for a successful reunification.

The two-day termination hearing began on July 31, 2018, and concluded on August 31, 2018. The circuit court rejected the Choates' renewed challenge to its jurisdiction and the court's decision not to return the children to them at the first permanency-planning hearing. It did, however, limit testimony to events primarily occurring after the first termination.

At the July 31, 2018 portion of the hearing, DHS presented evidence from Melissa Bedford, the children's long-time counselor who also conducted the family-therapy sessions, as well as testimony from Lisa and Rod Choate. On August 31, 2018, DHS continued its case by presenting additional evidence from Melissa Bedford, and also from Andrea Emerson, the caseworker assigned to the children. Lisa and Rod moved to dismiss at the conclusion of DHS's case, but the circuit court denied the motion, concluding sufficient evidence had been presented to support a prima facie case for termination. Lisa was the only witness presented in the parents' case, and the attorney ad litem presented Ashley Coffman, the court-appointed special advocate for K.C. and I.C.

At the close of the testimony, the court announced its decision and rationale for terminating Lisa's and Rod's parental rights. The termination order was entered on September 25, 2018.

Although appealing separately, the Choates' arguments are virtually identical and can best be discussed together. Their first two arguments rely on the premise that *Choate I* restored their presumption of parental fitness. First, they challenge the circuit court's jurisdiction following *Choate I* for any purpose other than to return the children to them. Next, they argue that even if the circuit court properly resumed jurisdiction, it erred in

3

refusing to return the children to them following the June 2017 permanency-planning hearing. They contend *Choate I* deemed them to be safe, fit, and no threat to the children, and the only authority the circuit court had following the *Choate I* mandate was to enter an order vacating its previous order of termination, returning the children to them, and closing the case. They further argue that once their presumption of parental fitness was restored by *Choate I*, the circuit court should have presumed they were acting in the children's best interest. Specifically, they contend, "[n]ot only did the [circuit] court completely ignore the Choates' constitutional rights as fit parents, but erroneously shifted the burden to them, and focused on the children's needs, as opposed to the parents' fitness and the presumption to which they were entitled as fit parents to act in the best interest of their children." We do not agree with their underlying premise.

*Choate I* neither explicitly nor implicitly restored a presumption of parental fitness to Lisa and Rod. Thus, the underlying premise for each of their first two arguments is without merit. *Choate I* held only that DHS had not sustained its burden of proving the statutory grounds for termination. It did not address the children's best interest, nor did it affect the August 25, 2015 dependency-neglect adjudication order. To be sure, the only order from which the Choates appealed in *Choate I* was the order terminating their parental rights. The dependency-neglect determination remained in full force and effect, and because the children had been out of Lisa and Rod's custody since 2015, the circuit court was obligated to do just what it did—assess the current status of the children and identify what steps would be necessary to reunite them with the parents. Reunification efforts began in earnest soon after the June 9, 2017 permanency-planning hearing.

4

Lisa and Rod provide no legal authority or convincing argument to persuade us that the circuit court was without authority to continue its jurisdiction over this case, to assess the children's current status, and to assure their best interest before returning custody to the Choates. We will not consider on appeal assignments of error unsupported by convincing argument or authority unless it is apparent without further research that the point is well taken. *Jones v. Arkansas Dep't of Human Servs.*, 361 Ark. 164, 205 S.W.3d 778. As we have explained many times, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Joslin v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 273, 577 S.W.3d 26.

For their third and final point, the Choates contend that even if the circuit court had authority to proceed to termination, the evidence presented was not sufficient to support either the statutory-grounds or best-interest findings. We disagree.

Termination of parental rights shall be based on clear and convincing evidence that (1) one or more statutory grounds as set forth in Arkansas Code Annotated § 9-27-341 (Supp. 2017) are met, and (2) termination is in the best interest of the juvenile. In determining the best interest of the juvenile, the court shall consider the likelihood that the juvenile will be adopted and the potential harm to the health and safety of the juvenile if returned to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2017). We review termination orders de novo but will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Harjo v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 268, 548 S.W.3d 865. A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with the firm conviction that a

mistake has been made. *Id.* We give a high degree of deference to the circuit court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Selsor v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 182, 516 S.W.3d 314.

*Statutory Grounds*

Proof of only one statutory ground is sufficient to support a termination. *Allison v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 424. Here, the circuit court found that each of the three grounds alleged by DHS—aggravated circumstances, subsequent factors, and 12-month failure to remedy—was proved by clear and convincing evidence. The Choates challenge all three grounds, but it is only necessary for us to address one.

"Aggravated circumstances" includes a determination that there is little likelihood services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B).* In its termination order, the circuit court thoroughly recited the efforts that had been made post-*Choate I* to reunify the children with Lisa and Rod.

Despite these efforts, the circuit court found Lisa and Rod still could not meet the physical, mental, and emotional needs of the children; the children had been out of the parents' care and custody for more than three years, which is "forever" in the lives of five- and six-year-old children; DHS had made reasonable efforts to provide services and finalize the permanency plan; and there was little likelihood of a successful reunification between the parents and the children.

The evidence before the circuit court included the testimony of Melissa Bedford, who began seeing K.C. on September 21, 2015, and I.C. on August 2, 2016. Bedford testified that K.C.'s initial diagnoses were PTSD, suspected child sexual abuse, ADHD,

6

confirmed child neglect, and suspected child physical abuse. I.C.'s initial diagnoses were PTSD, confirmed child neglect, unspecified disruptive impulse control and conduct disorder, suspected child sexual abuse, and suspected child physical abuse.

With respect to her observations when family therapy and visitations were resumed after *Choate I*, Bedford testified K.C. had regressed. She once again wanted her dolls to be naked during play therapy and began having increasing episodes of encopresis, or "pooping" accidents, particularly when she was around Rod. She explained she had been trying to teach Lisa and Rod "Conscious Discipline" parenting techniques for over a year. She testified she had told them they did not necessarily have to use "Conscious Discipline" techniques, but they needed to use some type of parenting techniques. Instead, they were not demonstrating any parenting techniques or skills. She stated that although Lisa had exhibited better parenting skills than Rod, she did not believe Lisa would continue to use good parenting after Bedford's involvement ended, and she remained concerned that Lisa continued to give more attention to I.C. than to K.C. Bedford reported that Lisa acknowledged she needed to stop being the children's friend and be more of a parent. She reported that Rod lacked connection with the girls. She explained that I.C. continued to choose Lisa over Rod and did not want to do the things Bedford asked her to do with Rod. She also testified that Rod constantly needed prompts and that he was still unable to demonstrate ability in techniques she had worked on with him for over a year.

Bedford described her safety concerns regarding the children to include Lisa and Rod's inattentiveness to the girls' needs and their lack of mental stability, including Rod displaying signs of talking to someone not present during sessions and Lisa's being too

emotional to see her daughters. One such occasion occurred following the January 25, 2018 permanency-planning hearing. Custody was scheduled to be returned to the Choates at that time, but Lisa reported to the circuit court at the hearing she did not believe it was in the children's best interest to be placed with her and Rod permanently.

Bedford told the court she did not favor giving custody to the parents. She said she was not convinced Lisa and Rod would care for the children, and she worried about the children's safety and development. She reported that the parents struggled with structure and getting K.C. to all her appointments would be an issue. Bedford explained the girls were going to need treatment for a long time due to incidents that occurred prior to their removal and that "all of this going back and forth" had been very traumatic. She recognized a clear connection between Rod and K.C.'s "pooping" incidents. She reported that Lisa saw the connection also but attributed it to the grandparents rather than to Rod. Regardless, Bedford saw the connection as a red flag and indicative of trauma. She said the girls expressed a desire for permanency and were very anxious about the future. She also stated her belief that Lisa would always side with Rod over the girls. Bedford estimated the Choates did their parenting "homework" only 50 percent of the time. She reported the children made better progress in their sessions without the parents; they regressed when parental visits were part of the process; and they were not as anxious outside the parents' presence. She told the circuit court it was not likely the services provided could get the children back in the home in a time that was appropriate for the children if the parents remained involved and that it was fair to say the children could have permanency very quickly if the parents were not involved.

Lisa and Rod testified as part of the DHS case. Lisa acknowledged the girls were severely covered in flea bites after a visit with her and Rod and that K.C. suffered an allergic reaction from the bites. DHS introduced photos that demonstrated the severity of the bites. She explained that she did not address the infestation prior to the girls' visit because they could not afford to have the pet and the house treated to avoid a reinfestation; yet court reports, which were submitted to the court as part of DHS's case, revealed Lisa and Rod could have addressed those issues, but instead decided to spend money on pizza, manicures, and a trip to the zoo. Lisa and Rod also did not seek medical attention for K.C.'s significant allergic reaction to the flea bites, and Lisa testified that she could not force K.C. to take benadryl.

Lisa also acknowledged the significant marital discord that resulted from Rod's addiction to adult pornography but denied that it had any effect on the children. She saw it as a marital issue only. Even so, Lisa acknowledged that K.C. had been able to access a photo of a naked woman on Rod's computer and that she had chastised K.C. for it. Lisa further acknowledged she found Rod looking at objectionable photos on his computer, and it caused so much marital strife that she temporarily moved out of their home as a result. She stated that she has since placed blocks on the computer and the smart phones and that Rod does not have the password. She reported she goes with him every week to his Celebrate Recovery visits. She acknowledged telling the circuit court at the January permanency-planning hearing that she could not handle caring for the children at that time but stated it was because things needed to be fixed at the apartment.

Finally, Lisa reported she had not been gainfully employed since 2017 but that Rod was employed through a temp agency. She described their apartment and how they had prepared it for the girls, and she described Rod as a good dad. She told the court she had found parts of Bedford's program and methods helpful and planned to use them.

Rod testified he understood his responsibility as a parent was to provide for his children's needs and explained he made $500 a week. He acknowledged his pornography addiction and the fact that he had relapsed twice since June 2017 but said he was fighting the addiction. He described his home as safe for the children. He reported that he has a psychiatrist and takes his meds for his bipolar diagnosis; that he has therapy once a month for his bipolar condition; and that his pornography addiction was also addressed if he needed help keeping it under control.

Andrea Emerson, the DHS caseworker, testified that her recommendation was to terminate Lisa's and Rod's parental rights. She reported her belief that the marital relationship was not stable. She also reported DHS's concerns about the number of family therapy sessions the Choates had missed and the Choates' explanations for having missed—regarding it as demonstrating a lack of stability, a failure to follow the circuit court's orders, and a lack of bonding with the children. Emerson further explained that since June 2017, DHS had twice come close to returning custody of the children to Lisa and Rod following a schedule of progressive unsupervised visitation and therapy sessions—only to have those efforts derailed when the Choates' handling of the flea infestation and bites demonstrated environmental neglect and a lack of judgment and parenting skills, and then again when Lisa declared at the January 2018 permanency-planning hearing that she could not handle

10

the return of the children at that time and instead left them with the grandparents. She testified she did not believe DHS could safely return the children to Lisa and Rod in a time frame consistent with the children's needs. She recommended it was in the children's best interest to terminate the parental rights and free them for adoption, explaining that they are highly adoptable.

The circuit court concluded that DHS had proved the statutory ground of aggravated circumstances, specifically that there was little likelihood that services would result in successful reunification. Although DHS was not required to prove that meaningful services to aid in reunification were provided, *Willis v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842, here, there was ample evidence of DHS's efforts to achieve reunification for this family. Despite DHS's offers of services to the parents, Lisa and Rod have not demonstrated that they can consistently provide a stable, safe, and appropriate environment for the children. They could not master basic parenting skills; they completed only 50 percent of the parenting-skills homework Bedford assigned; they missed several family-therapy sessions; and most significantly, on two separate occasions when they were very close to having custody returned to them, they exercised extremely poor judgment, demonstrated environmental neglect, and showed continued instability within their relationship that impacted the children. The first incident involved a flea infestation at their apartment, which resulted in serious flea bites for both girls and health consequences for K.C. because of an allergic reaction. Despite being aware of the infestation, Lisa and Rod exercised poor judgment by not timely addressing the problem and seeking appropriate medical attention for K.C. The second incident involved K.C., a mere child, easily

11

accessing adult nude photos on Rod's computer. K.C. was not only negatively impacted by being exposed to the inappropriate images on the computer, but she was also reprimanded by Lisa for having accessed the photo. In response to this incident, Lisa moved out of the home, which is indicative of the pattern of continued instability Rod's pornography addiction has had on the family. Lisa even told the court at the January 2018 permanency-planning hearing that she could not handle the return of the children at that time. Bedford's observations led her to conclude that the children's progress slowed, and sometimes even regressed, when they were with Lisa and particularly Rod and that a successful reunification could not be achieved in a time frame that would benefit K.C. and I.C. The evidence showed that I.C. and K.C. have lived with their maternal grandparents for more than three years, knowing that the grandparents cannot provide a permanent home for them. Bedford testified that the children yearn for stability and permanence.

A stable home is one of a child's most basic needs. *Selsor v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 182, 516 S.W.3d 314. We have repeatedly held that children's "'need for permanency and stability will override [a parent's] eleventh-hour efforts.'" *Gonzalez v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 425, at 11, 555 S.W.3d 915, 921 (quoting *Burleson v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 616, at 8, 535 S.W.3d 655, 659). A parent's continued inability to protect and care for his or her child and failure to benefit from the services provided demonstrate little likelihood that further services will result in a successful reunification. *Bentley v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 374, 554 S.W.3d 285.

12

Our de novo review of the record reveals no clear error in the circuit court's finding that the aggravated-circumstances ground was proved. It is therefore unnecessary to address the other two statutory grounds.

In addition to at least one statutory ground, a termination order must also be based on a finding by clear and convincing evidence that termination is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3). The juvenile code requires that a best–interest finding be based on a consideration of at least two factors: (1) the likelihood that if parental rights are terminated, the child will be adopted; and (2) the potential harm caused by returning the child to the custody of the parents. Ark. Code Ann. § 9-27-341(b)(3)(A). It is the overall evidence, not proof of each factor, that must demonstrate termination is in the child's best interest. *McFarland v. Arkansas Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005). In considering potential harm, proof of a specific potential harm is not required. *Pine v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. Moreover, evidence of potential harm must be viewed in a forward–looking manner and considered in broad terms. *Samuels v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 527, 443 S.W.3d 599.

Here, the circuit court concluded it was in the children's best interest to terminate Lisa's and Rod's parental rights. Once again, our de novo review of the record reveals no clear error. Andrea Emerson, the DHS caseworker, testified that K.C. and I.C. are highly adoptable, and the same evidence that supports the statutory ground for termination also supports the potential-harm finding.

Affirmed.

GRUBER, C.J., and WHITEAKER, J., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant Lisa Choate.

*Dusti Standridge*, for appellant Roderick Choate.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.